**PLAINTIFF'S EXHIBIT C**

## SECURITY AGREEMENT

This Security Agreement (as amended, modified or otherwise supplemented from time to time, this "*Security Agreement*"), dated as of April 11, 2017, is executed by Pauls Valley Hospital Authority d.b.a. Pauls Valley General Hospital, an Oklahoma public trust (together with its successors and assigns, the "*Company*"), in favor of SysInformation Healthcare Services, L.L.C. d/b/a EqualizeRCM Services ("*Lender*").

### RECITALS

A.   Company has issued a secured promissory note, dated as of the date hereof (as amended, modified or otherwise supplemented from time to time, the "*Note*") in an aggregate principal amount of $336,145.91 in favor of Lender.

B.   In order to induce Lender to extend the credit evidenced by the Note, Company has agreed to enter into this Security Agreement and to grant to Lender the security interest in the Collateral described below.

### AGREEMENT

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Company hereby agrees with Lender as follows:

1.   Definitions and Interpretation. When used in this Security Agreement, the following terms have the following respective meanings:

"*Collateral*" has the meaning given to that term in Section 2 hereof.

"*Obligations*" means all loans, advances, debts, liabilities and obligations, howsoever arising, owed by Company to Lender of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), now existing or hereafter arising under or pursuant to the terms of the Note, including, all interest, fees, charges, expenses, attorneys' fees and costs and accountants' fees and costs chargeable to and payable by Company hereunder and thereunder, in each case, whether direct or indirect, absolute or contingent, due or to become due, and whether or not arising after the commencement of a proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 *et seq.*), as amended from time to time (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding.

"*Permitted Liens*" means:

(a)   Liens for taxes not yet delinquent or Liens for taxes being contested in good faith and by appropriate proceedings for which adequate reserves have been established;

(b)   Liens in respect of property or assets imposed by law which were incurred in the ordinary course of business, such as carriers', warehousemen's, materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings;

(c)     Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, and other Liens to secure the performance of tenders, statutory obligations, contract bids, government contracts, performance and return of money bonds and other similar obligations, incurred in the ordinary course of business, whether pursuant to statutory requirements, common law or consensual arrangements;

(d)     Liens in favor of the Lender;

(e)     Liens upon any equipment acquired or held by Company or any of its Subsidiaries to secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition of such equipment, so long as such Lien extends only to the equipment financed, and any accessions, replacements, substitutions and proceeds (including insurance proceeds) thereof or thereto;

(f)     Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 2(g) of the Note;

(g)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of customs duties in connection with the importation of goods;

(h)     Liens which constitute rights of setoff of a customary nature or banker's liens, whether arising by law or by contract;

(i)     Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums;

(j)     leases or subleases and licenses or sublicenses granted in the ordinary course of Company's business; and

(k)     Liens incurred in the extension, renewal or refinancing of any of the indebtedness secured by any Permitted Lien.

"*UCC*" means the Uniform Commercial Code as in effect in the State of Oklahoma from time to time.

All capitalized terms not otherwise defined herein shall have the respective meanings given in the Note. Unless otherwise defined herein, all terms defined in the UCC have the respective meanings given to those terms in the UCC.

2.     Grant of Security Interest. As security for the Obligations, Company hereby pledges to Lender and grants to Lender a security interest of first priority (except for Permitted Liens) in all right, title and interests of Company in and to the property described in **Attachment 1** hereto, whether now existing or hereafter from time to time acquired (collectively, the "*Collateral*").

Notwithstanding the foregoing, the security interest granted herein shall not extend to and the term "*Collateral*" shall not include any equipment or other property subject to a third party's purchase money security interests Liens, *provided* that such third party's Liens are Liens of the type described in subsections (e) and (k) of the definition of Permitted Liens; and *provided further* that such equipment or other property shall be deemed "*Collateral*" hereunder if such third party's Lien is released or otherwise terminated.

{01355/0011/00196274.2}

3. <u>General Representations and Warranties</u>. Company represents and warrants to Lender that (a) Company is the owner of the Collateral (or, in the case of after-acquired Collateral, at the time Company acquires rights in the Collateral, will be the owner thereof) and that no other Person has (or, in the case of after-acquired Collateral, at the time Company acquires rights therein, will have) any right, title, claim or interest (by way of Lien or otherwise) in, against or to the Collateral, other than Permitted Liens; (b) upon the filing of UCC-1 financing statements in the appropriate filing offices, Lender has (or in the case of after-acquired Collateral, at the time Company acquires rights therein, will have) a first priority perfected security interest in the Collateral to the extent that a security interest in the Collateral can be perfected by such filing, except for Permitted Liens; (c) all Inventory has been (or, in the case of hereafter produced Inventory, will be) produced in compliance with applicable laws, including the Fair Labor Standards Act; (d) all accounts receivable and payment intangibles are genuine and enforceable against the party obligated to pay the same; and (e) the originals of all documents evidencing all accounts receivable and payment intangibles of Company and the only original books of account and records of Company relating thereto are, and will continue to be, kept at the address of the Company set forth in Section 8(a) of this Security Agreement or at such other locations as Company may establish in accordance with Section 4(d).

4. <u>Covenants Relating to Collateral</u>. Company hereby agrees:

(a) to perform all acts that may be necessary to maintain, preserve, protect and perfect the Collateral, the Lien granted to Lender therein and the perfection and priority of such Lien, except for Permitted Liens;

(b) not to use or permit any Collateral to be used (i) in violation in any material respect of any applicable law, rule or regulation, or (ii) in violation of any policy of insurance covering the Collateral;

(c) to pay promptly when due all taxes and other governmental charges, all Liens and all other charges now or hereafter imposed upon or affecting any Collateral;

(d) without 15 days' written notice to Lender, not to change Company's name or place of business (or, if Company has more than one place of business, its chief executive office), or the office in which Company's records relating to accounts receivable and payment intangibles are kept, or Company's state of incorporation; and

(e) to procure, execute and deliver from time to time any endorsements, assignments, financing statements and other writings reasonably deemed necessary or appropriate by Lender to perfect, maintain and protect its Lien hereunder and the priority thereof and to deliver promptly upon the request of Lender all originals of Collateral consisting of instruments.

5. <u>Authorized Action by Lender</u>. Company hereby irrevocably appoints Lender as its attorney-in-fact (which appointment is coupled with an interest) and agrees that Lender may perform (but Lender shall not be obligated to and shall incur no liability to Company or any third party for failure so to do) any act which Company is obligated by this Security Agreement to perform, and to exercise such rights and powers as Company might exercise with respect to the Collateral, including the right to (a) collect by legal proceedings or otherwise and endorse, receive and receipt for all dividends, interest, payments, proceeds and other sums and property now or hereafter payable on or on account of the Collateral; (b) enter into any extension, reorganization, deposit, merger, consolidation or other agreement pertaining to, or deposit, surrender, accept, hold or apply other property in exchange for the Collateral; (c) make any compromise or settlement, and take any action it deems advisable, with respect to the Collateral; (d) insure, process and preserve the Collateral; (e) pay any indebtedness of Company relating to the Collateral; and (f) file UCC financing statements and execute other documents, instruments and agreements required hereunder; *provided, however*, that Lender shall not exercise any such powers granted pursuant to subsections (a) through (e) prior

to the occurrence of an Event of Default and shall only exercise such powers during the continuance of an Event of Default. Company agrees to reimburse Lender upon demand for any reasonable costs and expenses, including attorneys' fees, Lender may incur while acting as Company's attorney-in-fact hereunder, all of which costs and expenses are included in the Obligations. It is further agreed and understood between the parties hereto that such care as Lender gives to the safekeeping of its own property of like kind shall constitute reasonable care of the Collateral when in Lender's possession; *provided, however*, that Lender shall not be required to make any presentment, demand or protest, or give any notice and need not take any action to preserve any rights against any prior party or any other person in connection with the Obligations or with respect to the Collateral.

6. Litigation and Other Proceedings

(a) Company shall have the right and obligation to commence and diligently prosecute such suits, proceedings or other actions for infringement or other damage, or reexamination or reissue proceedings, or opposition or cancellation proceedings as are reasonable to protect any of the patents, trademarks, copyrights, mask works or trade secrets. No such suit, proceeding or other actions shall be settled or voluntarily dismissed, nor shall any party be released or excused of any claims of or liability for infringement, without the prior written consent of Lender, which consent shall not be unreasonably withheld.

(b) Upon the occurrence and during the continuation of an Event of Default, Lender shall have the right but not the obligation to bring suit or institute proceedings in the name of Company or Lender to enforce any rights in the Collateral, including any license thereunder, in which event Company shall at the request of Lender do any and all lawful acts and execute any and all documents reasonably required by Lender in aid of such enforcement. If Lender elects not to bring suit to enforce any right under the Collateral, including any license thereunder, Company agrees to use all reasonable measures, whether by suit, proceeding or other action, to cause to cease any infringement of any right under the Collateral by any Person and for that purpose agrees to diligently maintain any action, suit or proceeding against any Person so infringing necessary to prevent such infringement.

7. Default and Remedies.

(a) Default. Company shall be deemed in default under this Security Agreement upon the occurrence and during the continuance of an Event of Default (as defined in the Note).

(b) Remedies. Upon the occurrence and during the continuance of any such Event of Default, Lender shall have the rights of a secured creditor under the UCC, all rights granted by this Security Agreement and by law, including the right to: (a) require Company to assemble the Collateral and make it available to Lender at a place to be designated by Lender; and (b) prior to the disposition of the Collateral, store, process, repair or recondition it or otherwise prepare it for disposition in any manner and to the extent Lender deem appropriate. Company hereby agrees that ten days' notice of any intended sale or disposition of any Collateral is reasonable. In furtherance of Lender's rights hereunder, Company hereby grants to Lender an irrevocable, non-exclusive license, exercisable without royalty or other payment by Lender, and only in connection with the exercise of remedies hereunder, to use, license or sublicense any patent, trademark, trade name, copyright or other intellectual property in which Company now or hereafter has any right, title or interest together with the right of access to all media in which any of the foregoing may be recorded or stored.

(c) Application of Collateral Proceeds. The proceeds and/or avails of the Collateral, or any part thereof, and the proceeds and the avails of any remedy hereunder (as well as any other amounts of any kind held by Lender at the time of, or received by Lender after, the occurrence of an Event of Default) shall be paid to and applied as follows:

    (i) *First*, to the payment of reasonable costs and expenses, including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made hereunder by Lender;

    (ii) *Second*, to the payment to Lender of the amount then owing or unpaid on the Note (to be applied first to accrued interest and second to outstanding principal);

    (iii) *Third*, to the payment of other amounts then payable to Lender under any of the Transaction Documents; and

    (iv) *Fourth*, to the payment of the surplus, if any, to Company, its successors and assigns, or to whomsoever may be lawfully entitled to receive the same.

  8. Miscellaneous.

    (a) Notices. Except as otherwise provided herein, all notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail (if to the Lender) or otherwise delivered by hand, messenger or courier service addressed:

    (i) if to Lender, to Lender's address, facsimile number or electronic mail address as shown in Company's records, as may be updated in accordance with the provisions hereof; or

    (ii) if to the Company, to the attention of the President of Company at 3267 Bee Caves Road, Suite 107-511, Austin, Texas 78746, or at such other current address as Company shall have furnished to the Lender, with a copy (which shall not constitute notice) to James Landon, Streusand, Landon & Ozburn, LLP, 811 Barton Springs Road, Suite 811, Austin, Texas 78704.

Each such notice or other communication shall for all purposes of this Security Agreement be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via facsimile, upon confirmation of facsimile transfer or, if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. In the event of any conflict between Company's books and records and this Security Agreement or any notice delivered hereunder, Company's books and records will control absent fraud or error.

    (b) Termination of Security Interest. Upon the payment in full of all Obligations, the security interest granted herein shall terminate and all rights to the Collateral shall revert to Company. Upon such termination, Lender hereby authorizes Company to file any UCC termination statements necessary to effect such termination and Lender will execute and deliver to Company any additional documents or instruments as Company shall reasonably request to evidence such termination.

    (c) Nonwaiver. No failure or delay on Lender's part in exercising any right hereunder shall operate as a waiver thereof or of any other right nor shall any single or partial exercise of any such right preclude any other further exercise thereof or of any other right.

(d) <u>Amendments and Waivers</u>. This Security Agreement may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by Company and Lender. Each waiver or consent under any provision hereof shall be effective only in the specific instances for the purpose for which given.

(e) <u>Assignments</u>. This Security Agreement shall be binding upon and inure to the benefit of Lender and Company and their respective successors and assigns; *provided, however*, that Company may not sell, assign or delegate rights and obligations hereunder without the prior written consent of Lender.

(f) <u>Cumulative Rights, etc</u>. The rights, powers and remedies of Lender under this Security Agreement shall be in addition to all rights, powers and remedies given to Lender by virtue of any applicable law, rule or regulation of any governmental authority, any Transaction Document or any other agreement, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently without impairing Lender's rights hereunder. Company waives any right to require Lender to proceed against any person or entity or to exhaust any Collateral or to pursue any remedy in Lender's power.

(g) <u>Partial Invalidity</u>. If at any time any provision of this Security Agreement is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Security Agreement nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

(h) <u>Construction; Lender Acknowledgement</u>. Each of this Security Agreement and the other Transaction Documents is the result of negotiations among, and has been reviewed by, Company and Lender and each has had the opportunity to have them reviewed by their respective counsel. Accordingly, this Security Agreement and the Promissory Note shall be deemed to be the product of all parties hereto, and no ambiguity shall be construed in favor of or against Company or Lender.

(i) <u>Entire Agreement</u>. This Security Agreement taken together with the other Transaction Documents constitute and contain the entire agreement of Company and Lender and supersede any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.

(j) <u>Other Interpretive Provisions</u>. References in this Security Agreement and each of the other Transaction Documents to any document, instrument or agreement (a) includes all exhibits, schedules and other attachments thereto, (b) includes all documents, instruments or agreements issued or executed in replacement thereof, and (c) means such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Security Agreement or any other Transaction Document refer to this Security Agreement or such other Transaction Document, as the case may be, as a whole and not to any particular provision of this Security Agreement or such other Transaction Document, as the case may be. The words "include" and "including" and words of similar import when used in this Security Agreement or any other Transaction Document shall not be construed to be limiting or exclusive.

(k) <u>Governing Law</u>. This Security Agreement shall be governed by and construed in accordance with the laws of the State of Oklahoma without reference to conflicts of law rules (except to the extent governed by the UCC).

{01355/0011/00196274.2}

(l) <u>Counterparts</u>. This Security Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

IN WITNESS WHEREOF, Company has caused this Security Agreement to be executed as of the day and year first above written.

**Pauls Valley Hospital Authority,**
an Oklahoma public trust

By: _/s/ Gary Alfred_
Name: Gary Alfred
Title: Chairman

AGREED:

LENDER

_____
SysInformation Healthcare Services, L.L.C.
d/b/a EqualizeRCM Services

(l) <u>Counterparts</u>. This Security Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

IN WITNESS WHEREOF, Company has caused this Security Agreement to be executed as of the day and year first above written.

Pauls Valley Hospital Authority,<br>
an Oklahoma public trust<br><br>

By:_____<br><br>

Name:_____<br><br>

Title:_____

AGREED:

LENDER

*/s/ Michael A. Hill*

SysInformation Healthcare Services, L.L.C.
d/b/a EqualizeRCM Services

{01355/0011/00196274.2}

**Attachment 1**
**to Security Agreement**

All right, title, interest, claims and demands of Company in and to the Company's personal property, including, without limitation, the following:

(i) All Accounts;

(ii) All Chattel Paper;

(iii) All Commercial Tort Claims listed on **Exhibit A**;

(iv) All Deposit Accounts and cash;

(v) All Documents;

(vi) All Equipment;

(vii) All General Intangibles;

(viii) All Goods;

(ix) All Instruments;

(x) All Intellectual Property;

(xi) All Inventory;

(xii) All Investment Property;

(xiii) All Letter-of-Credit Rights

(xiv) To the extent not otherwise included, all Proceeds and products of any and all of the foregoing, and all accessions to, substitutions and replacements for, and rents and profits of each of the foregoing.

The term *"Intellectual Property"* means all intellectual and similar property of every kind and nature now owned or hereafter acquired by Company, including inventions, designs, patents (whether registered or unregistered), copyrights (whether registered or unregistered), trademarks (whether registered or unregistered), trade secrets, domain names, confidential or proprietary technical and business information, know-how, methods, processes, drawings, specifications or other data or information and all memoranda, notes and records with respect to any research and development, software and databases and all embodiments or fixations thereof whether in tangible or intangible form or contained on magnetic media readable by machine together with all such magnetic media and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

All capitalized terms used in this **Attachment 1** and not otherwise defined herein, shall have the respective meanings given to such terms in the Uniform Commercial Code of the State of Oklahoma as in effect from time to time.

{01355/0011/00196274.2}

**Exhibit A
to
Attachment 1 to Security Agreement**

**Commercial Tort Claims**

None.

{01355/0011/00196274;2}